## DUNCAN et al. v. TEXAS & P. RY. CO.*
### No. 4366.

Court of Appeal of Louisiana. Second Circuit.

Nov. 10, 1932.

Parsons & Colvin, of Mansfield, for appellant.

Craig, Bolin & Magee, of Mansfield, for appellees.

PALMER, J.

Plaintiffs bring this suit to recover damages in the sum of $560 for the loss by fire of a barn, certain tools and implements, certain outhouses, certain pecan trees, and other trees and timber upon the lands owned by them. They allege in effect that the employees of the defendant company set fire to the grass, rubbish, and undergrowth on its right of way, and negligently permitted it to spread to the lands and premises of plaintiffs and burn said improvements, which they value at the sum sued for.

Defendant joins issue by entering a general denial to each and all of plaintiffs' allegations. The lower court rendered judgment in favor of plaintiffs for the amount sued for, from which judgment defendant has appealed.

### Opinion.

The railroad of the defendant company at the place where this fire occurred runs almost due north and south, and is paralleled on the west side by a concrete highway. The location of the fire was some three or four miles north of the town of Grand Cane. Just opposite the place where the fire originated on the east side of the railroad track is situated the property of plaintiffs. The fire began shortly after 1 o'clock in the afternoon of October 12, 1931, and, after getting beyond the control of the section crew and other assistance they received from the surrounding neighbors, it spread to the property of plaintiffs and destroyed two barns, about a half mile of fence, six pecan trees, a chinaberry tree, and a red oak tree situated in the yard of plaintiffs, together with certain tools and implements, all of which plaintiffs testified was well forth the sum of $560. Defendant has not seriously questioned the value of the improvements so destroyed.

Plaintiffs rest their claim upon the direct charge that the fire in question was set out by defendant's section crew in an effort to burn off the right of way, and that defendant was thereby grossly negligent in permitting it to spread from the right of way to the property of plaintiffs and destroy it. The direct proof of plaintiffs to the effect that defendant's section crew set out the fire on its right of way is limited to a colored woman living on a plantation near the point of the origin of the fire. She testified that she lives on the west side of the railroad and on the opposite side to plaintiffs' property; that her home is about a quarter or half a mile from the railroad. She says that the fire began about 1 or 2 o'clock in the afternoon, at which time she was at her house with her three little children; that, when she first saw it, the section men were setting fire on the side of the railroad next to the highway, that is, the west side. She testified that, before the fire was set out, she saw the section men coming from down towards town, meaning from the direction of Grand Cane, and that they were traveling on a hand car, which, after stopping, they lifted off the track, and that they left the hand car behind, walked up the track, and started the fire.

On cross-examination, she says she did not see but one member of the section crew setting the fire, that he appeared to be using a torch, and that this was on the west side of the track. She said that all the section crew came together on the hand car to the place where she saw this one man starting the fire right after he alighted from the hand car. She further testified that, at the time she saw this man setting out the fire, he also had a pine top which she "reckoned" he used to keep the fire from getting away from him.

Frank Strother, working in the maintenance department of the highway, first saw the fire from the place of his work, about a quarter of a mile north from where the fire started. He says the fire began just a little after 1 o'clock; that at the time he first saw it he was on the west side of the railroad and on the opposite side from plaintiffs' place. He says the fire had just started when he first saw it; that he had a clear view; that it was about ten or fifteen minutes after he first saw the fire before he saw any one around it, at which time it had made some headway; and that he saw a negro run up on the west side of the railroad and go down between the tracks. He says the section foreman asked him to help fight the fire, saying, "Will you come and help me? I'm about to lose the house," or "It looks like I'll lose the house."

H. H. Prothro, another employee of the highway commission, was working with the witness Strother at the time, and saw about the same thing that Strother testified he saw. He said the fire was burning on both sides of the railroad track. He also stated that he did not see any one at the fire when he first observed it, but that a few moments later the section crew appeared. He also testified that the section foreman asked him to assist in fighting the fire, saying, "Will you come and help me? I'm about to lose the house."

Plaintiffs further established the fact that defendant's section crew, a few days previous, had burned the rubbish on the right of way just north of the place where this fire in question originated. It was also admitted by the section crew that the next portion of the right of way to be burned was the place where this fire started.

The section foreman, J. T. Goldman, and his crew of colored laborers—at least four of them—all denied that they had any connec-

tion with starting the fire in question. They testified that they were engaged in cutting the rubbish upon the right of way, and that on Friday before this fire on the Monday following they cut the right of way some distance below the place of this fire; that they did not work on Saturday, and, upon resuming work on Monday morning, continued to cut the rubbish toward Grand Cane until noon, at which time they had 'reached the home of Monroe Mosely, which is situated about three-fourths of a mile south, or in the Grand Cane direction, from the place of the origin of the fire; that at this point they ate their lunch and at 1 o'clock returned to their labor; that about ten or fifteen minutes after resuming labor they discovered some smoke or fire to their north, got upon their hand car, went up to the fire, and began the work of trying to extinguish it, and that they were not at the point where the fire originated at any time during Monday morning. They were corroborated as to the place where they worked and where they ate dinner by the testimony of Monroe Mosely and Adale Lee Mosely.

Mrs. Drew Stanley, whose home is situated between the point of the origin of the fire and Monroe Mosely's place, where the section crew ate dinner, also corroborates the section foreman and the section crew as to where the crew worked that morning; that at about 11 o'clock that morning the section crew was in front of her house performing their work of cutting the weeds on the right of way. She further testified that, while she was washing her dishes after lunch, she saw the section crew on the hand car going north.

The members of the section crew testified that, as they reached the place of the fire, one of the crew, Romeo Gilliard, went immediately to the west of the railroad track to get some tops with which to fight the fire; and that, after securing the tops, he came back, crossed the track and began fighting the fire, at which time it had already burned alongside the pavement. They denied that Gilliard had any torch, as the Williams woman testified, and stated that he only had the tops with which to fight the fire. They testified that other members of the section crew also got some brush tops and fought the fire.

The witnesses Prothro and Strother, offered by plaintiffs, in our view of the matter, corroborate the testimony of the defendant's witnesses when they say that, at the time they first observed the fire, they noticed no person in sight at or near the fire. If Meto Williams' testimony is correct, the entire crew was there upon the scene when one of them began setting out the fire. There were no obstructions between where the two highway employees were and the place of the fire. They could scarcely see the fire without seeing the section crew, if they were there, and the fact that

they did not see them argues strongly in favor of the conclusion that the section crew was not there at the time the fire began.

These two witnesses also corroborate defendant's witnesses regarding the action of one of the members of the section crew, Romeo Gilliard, to the effect that Gilliard, upon reaching the fire, went to the west of the railroad track to get some brush tops with which to fight the fire, rather than to start a fire, as Meto Williams, plaintiffs' witness, appeared to have interpreted his acts. So far as Meto Williams' testimony is concerned, it is not our thought that she intentionally falsified, but we can easily see how she could have misunderstood the movements of the members of the section crew. At the distance from where she saw them, it could easily have appeared to her, at the time one of the crew was fighting fire with a brush top, that he appeared at the same time to be setting fire to the rubbish, and yet we are convinced from the testimony that such conclusions are incorrect.

As stated by counsel for plaintiffs, there are only two questions presented for our decision, and they are: (1) Did the employees of the railroad company negligently set out the fire on the right of way? And, if so (2) What is the amount of damages plaintiffs sustained in the destruction of their property?

As to the second question, we have no doubt that plaintiffs sustained the damages alleged. Plaintiffs' proof is definite and positive on that point, and it is not offset by any evidence by the defendant. If defendant is responsible for the burning of plaintiffs' properties, then they should recover, but, if defendant is not responsible for the fire, then plaintiffs cannot recover.

As to the question of whether or not the employees of the railroad company set fire on the right of way, plaintiffs, of course, carried the burden of affirmatively proving that fact. They alleged definitely and specifically that the fire had its origin from the hands of the employees of the railroad company, and they sought to prove that these acts were done by members of the section crew.

We are fully aware of the well-established rule that the findings of the lower court on questions of fact will not be disturbed by the appellate court, unless such findings are manifestly erroneous, but in this case plaintiffs rely entirely upon the testimony of one witness, in so far as the direct evidence is concerned, to prove that the defendant's employees set out the fire in question; while against that testimony, we have the direct evidence of five witnesses constituting the section crew, who deny emphatically that they started the fire. These five witnesses are corroborated in their statement that the fire was

in progress when they arrived upon the scene by two of plaintiffs' witnesses, the highway employees. They are also corroborated by two or three other disinterested witnesses that they were something like three-fourths of a mile below the place of the fire at the time the fire is said to have originated.

The first duty of the court is to reconcile this conflicting testimony, if possible, and this we think can be done without disregarding anybody's evidence. As we have already said, the testimony of Meto Williams who says she saw one of the section crew run on the west side with a brush top in one hand and a torch in the other can be reconciled with the evidence of all other witnesses that Romeo Gilliard, at the time, was merely fighting the fire then in progress.

As much as we dislike to do so, we are compelled to disturb the findings of the lower court on the question of fact, for it is our view that plaintiffs failed to discharge the burden of proof resting upon them as to the origin of this fire. Under these circumstances, it is unnecessary to discuss further the question of damages plaintiffs sustained by the burning of their properties.

The judgment of the lower court is reversed, and there is now judgment for the defendant rejecting plaintiffs' demands; plaintiffs appellees to pay all costs of both courts.

DREW, J., dissents.